UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cr-34 |
| | ) | *Collier/Carter* |
| JEROME DUKINS | ) | |
| RODNEY MERELAN | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendants Jerome Dukins and Rodney Merelan move to suppress all evidence, cash and electronics, found in the vehicle in which they were passengers when it was detained and subsequently searched on March 4, 2011 by police in the Wal-Mart parking lot. Because the undersigned finds police had reasonable suspicion to stop the vehicle as it was leaving the parking lot, it is RECOMMENDED that the defendants' motions to suppress (Docs. 25 and 26) be DENIED.

II. Relevant Facts

The undersigned held an evidentiary hearing on defendants' motions to suppress on Wednesday, November 9, 2011. Angie Price and Amanda Johnson, both loss prevention specialists with the Wal-Mart store in Soddy-Daisy, Tennessee, testified. Officers Jeremy Wright and Craig Winners and Detective Charlie Kilgore of the Soddy Daisy Police Department also testified. Based on their testimony and the evidence presented at the evidentiary hearing, the undersigned makes the following findings of fact:

Angie Price is an asset protection coordinator for the Wal-Mart store in Soddy Daisy, Tennessee. She has been a Wal-Mart employee for eight years and worked in safety and security

1

for the past six years. Amanda Johnson has been employed with the Wal-Mart store in Soddy Daisy, Tennessee where she has been for the past four years. She has worked in loss prevention with Angie Price for approximately one year. Both Price and Johnson received one month of training in loss prevention to identify shop lifters and scammers. Price has extensive experience in identifying scams, and Johnson testified that she has had experience in dealing with scams as well.

On February 28, 2011, Angie Price and Amanda Johnson received two emails from two different Wal-Mart stores within the Chattanooga area advising them to be on the lookout for individuals trying to pass counterfeit one hundred dollar bills. The first email stated *in toto*, "Attempted to pass a counterfeit $100.00. He was accompanied by the young female half in the shot." (Gov. Ex. 1). The email was accompanied by a grainy picture of a black male and a black female taken from a store surveillance camera. (Gov. Ex. 2) The second email stated *in toto*, "We just sold this gentleman two TV's and he paid with 5 - $100 counterfeit bills. May be coming to a store near you!" It was accompanied with a grainy picture of a black male taken from a store surveillance camera. (Gov. Ex. 2.) Both Price and Johnson were already familiar with scams in which individuals purchase high-end electronic items with counterfeit bills and attempt to return the items at another store for real money. They both testified they thought these emails referred to just such a scheme.

At all times relevant to this motion, the Soddy Daisy Wal-Mart store where Price and Johnson are employed had approximately 200 surveillance cameras inside the store and 20-30 surveillance cameras on the store roof directed at the store parking lot. Nearly every area in the store and the parking lot was therefore on camera. These security cameras post surveillance

2

footage on three 42" security TV's with 16 separate captions. These TVs are located inside the security office within the store.

On March 4, 2011, Price and Johnson were in the security office in the Soddy Daisy Wal-Mart store watching the security TV's. One of the security cameras was focused on the service desk where returns are made, and Johnson saw a black male waiting to return what appeared to be a high-end electronic item, a camera, which he had placed on the counter. Johnson noticed the man looked nervous as he was looking around, fidgeting and texting on his cell phone. Johnson alerted Price who called the service desk to find out how the man had paid for the camera that he wanted to return. The service desk told Price the man, who had a receipt, had paid with cash. Price decided to roll back the surveillance tapes from the service area to the parking lot in order to determine from which vehicle the man had come. As she rewound the tape, she could see that he had come from a vehicle located closer to the back of the parking lot than the front entrance of the parking lot.[1] By continuing to watch the surveillance video of the man's vehicle in the parking lot, Price and Johnson also noticed that about five minutes after the man had walked to the service desk to make the return, another man exited the same vehicle, retrieved something from the trunk, and walked to the service desk to wait in line to make a return. Johnson and Price observed on the video that the first man completed his return and walked out of the service area, passing the second man without speaking to or acknowledging him in any way. At some point during this process, while both men were still waiting to return their items, Price sent an employee to look at the tag of the men's vehicle and the employee

---

[1] The surveillance tape introduced into evidence at the suppression hearing showed that there were open parking spaces closer to the front entrance.

reported back that it was an out-of-state tag. Johnson testified that she was told the tag was from New York and that the employee gave her the tag number. The government presented the video tape from the Wal-Mart store as evidence at the suppression hearing which confirmed Johnson's and Price's testimony.

Price and Johnson found the men's conduct as a whole to be very suspicious. They testified that in their experience shoplifters and scammers frequently park far from the entrance of the store and often arrive in vehicles with out-of-state tags. They also testified that scammers frequently purchase items fraudulently with "cash" from one store and attempt to return the items for a refund at another store. Johnson also explained that it was significant that the men appeared to be texting because, in her experience, scammers are often texting someone inside or outside the store who is acting as a lookout during the scam. Price further testified that in her experience, persons involved in scams to make fraudulent returns generally retrieve merchandise from the trunk. Price and Johnson also noted that the first man frequently looked over his shoulder as if on the lookout and appeared very nervous. Based on all this information, including the fact that the first man had purchased the expensive camera with cash and that he did not acknowledge the second man who had come from the same car, Price decided to call Detective Charlie Kilgore with the Soddy Daisy Police Department.

Price explained the situation to Det. Gilgore who directed her to call police dispatch because he was on a call. Price called police dispatch and told them what she knew. A few minutes later, at 6:24 pm, Soddy Daisy Police Officer Jimmy Wright pulled up in front of the store in his patrol car. Amanda Johnson walked outside and talked to him there in front of the store for approximately 2 ½ minutes. Johnson testified that Officer Wright told her she must

4

provide him with enough information to have "reasonable cause" to stop the defendants' vehicle. Johnson told Officer Wright that the men had parked their vehicle far from the entrance, that the vehicle had an out-of-state tag, that the men had come from the same vehicle but had left it at separate times, and that both men had gone to the service desk with cash receipts to make returns of high-end electronics, but neither man had acknowledged the other. She explained that these factors fit a Wal-Mart wide "BOLO"[2] for male parties with out-of-state tags making purchases of high end electronics using counterfeit bills and then attempting to make returns at a different Wal-Mart store for cash. Wright testified he understood the significance of the vehicle being parked far from the entrance as it was his experience that shoplifters and persons making fraudulent purchases or returns will park as far back as possible in the parking lot.[3]

    While Johnson was continuing to talk to him, Wright decided he needed to stop the suspect vehicle because it was pulling out of the lot, and he felt he already had enough information to constitute reasonable suspicion. Wright notified K-9 Officer Craig Winners, who had already been dispatched to the Wal-Mart parking lot, to assist him in the stop. At 6:25 pm, Winners and Wright stopped the defendants' vehicle in the parking lot. Winners' unmarked SUV parked immediately behind the defendants' vehicle and Wright's patrol car parked next to it. Winners exited his patrol car and approached the open driver's side window of the defendants' vehicle. As he looked into the back window, he could see what appeared to be a leafy material which he thought was marijuana "shake" scattered on the back seat, and he could smell the faint

---

[2]"BOLO" is an acronym for "be on the look-out."

[3]The undersigned surmises that parking far back in the lot is an attempt to prevent surveillance cameras from recording the license plate tag on the vehicle.

5

odor of marijuana. There were three people in the vehicle. One defendant was sitting in the front passenger seat and the other defendant was sitting in the middle of the back seat. The driver was not one of the defendants in this case.

Winners explained marijuana "shake" is flakes of marijuana like that which might have fallen onto the seat and floor as a marijuana cigarette was rolled. He testified there was very little of it there but enough that he could identify it. He further testified that during his years as a police officer on the Soddy Daisy Police force, he has had many opportunities to investigate marijuana.

Winners asked the driver to step out of the vehicle. He also asked the defendants to step out. The defendant who exited the back seat slid across the seat to exit out the back driver's side door; he did not shut the door. At this point, Det. Charlie Kilgore had also arrived on the scene. Det. Kilgore asked for consent to search the vehicle, and consent was denied. The three men from the vehicle were patted down and led a few feet from the vehicle. Officer Winners walked his drug dog around the vehicle. The dog alerted on the seam between the driver's side front and back doors. During the walk around, the dog stuck his nose and head inside the vehicle through the opened driver's side back door.

K-9 Officer Craig Winners has been with the Soddy Daisy Police Department for four years. He has been a canine handler for two years. His dog, Chase, is certified for narcotics only and is recertified every year. Chase trains monthly and is certified to detect a number of controlled substances including marijuana. Winners himself is trained to avoid giving a dog cues in order to entice the dog to make alerts.

6

After Chase alerted on the vehicle by scratching and pawing at it, the officers conducted a search of the entire vehicle. A large amount of money, $8,777.00 in cash, was found in the console of the vehicle. Wright testified he thought some of it was counterfeit as the money felt "funny." It was determined that evening by an officer from the Secret Service that $5,100.00 of it was, in fact, counterfeit. The officers also found in the trunk, under a spare tire, three baggies of a green leafy substance which they believed to be marijuana packaged for resale. In addition, they found a large number of electronics including six I-Pads, two cell phones, a laptop and four video cameras, all still in their original packaging in the trunk. The total value of these items was later determined to be approximately $8,000. Some of the items were in Wal-Mart bags and others were not. Some of the bags were open and the items could clearly be seen. Winners testified that upon seeing the electronics in the trunk, he immediately suspected the electronics were part of the suspected scam to buy high end electronics with counterfeit money and return them for genuine money.

Both Officer Winners and Detective Kilgore testified they saw marijuana "shake" on the floorboard on the driver's side backseat while conducting the search. It is not clear what eventually happened to the "shake," whether it was collected and destroyed or sent to a laboratory for testing. The defendants introduced into evidence a photograph taken by Detective Kilgore of the backseat of the vehicle (Def. Ex. 2). The photograph is in black and white and shows what appear to be white flecks on the backseat and on the floorboard. Officer Wright could not identify this as shake, but Detective Kilgore, who took the picture, stated that the white flecks in the photograph were marijuana shake. Kilgore also testified that when he first looked into the vehicle, he observed a baggy of marijuana on the backseat. However, he admitted that

7

the photograph contained no baggy of marijuana on the backseat, and he did not know what had happened to the baggy.

Pursuant to Soddy Daisy Police Department policy, because all three of the individuals in the vehicle were arrested, the car was seized and impounded and all the contents of the vehicle were inventoried including the electronics and the money.

### III. Analysis

Defendants assert police lacked a constitutional basis for initially stopping the vehicle in which they were passengers, and thus all evidence found in the vehicle must be suppressed as fruit of the poisonous tree. At the suppression hearing, defendant Dukins also raised for the first time an argument that even if he did not have a legitimate expectation of privacy in the searched vehicle because he was only a passenger, he still could contest the actual seizure of the electronics which were found in the trunk of the car, presumably because those electronics, or at least some of those electronics, belonged to Dukins.

Mere passengers in a vehicle do not have a legitimate expectation of privacy in the vehicle. *See Rakas v. Illinois,* 439U.S. 128, 148 (1978) (holding that defendants had no legitimate expectation of privacy in the glove compartment or area beneath the seats in a car in which they were merely passengers); *United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008) (holding that the passengers lacked standing to challenge the search of the van in which they were riding). Passengers may, however, contest the stop of the vehicle in which they are riding because the detention of that vehicle also results in the detention of the passengers. *See Brendlin v. California*, 551 U.S. 249, 251, 259 (2007); *Torres-Ramos*, 536 F.3d at 549. Further, "even in cases where no reasonable expectation of privacy exists, a passenger [defendant] 'may

8

still challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity.'" *Torres-Ramos*, 536 F.3d at 549 (brackets original) (quoting *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007)); *accord United States v. Jimenez*, 2009 WL 2905933 *10 (E.D. Tenn. Sept. 2, 2009).

A police officer conducts what is known as a "*Terry*" stop or an investigatory stop when he or she briefly detains a person without probable cause in order to investigate a possible crime. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Bailey*, 302 F.3d 652 (6th Cir. 2002). In order to conduct an investigatory stop within constitutional boundaries, an officer must have a reasonable suspicion based on specific and articulable facts that the individual he seeks to detain is involved in criminal activity. *Terry,* 392 U.S. 1; *United States v. Arvizu*, 534 U.S. 266, 750 (2002); *United States v. Sharpe*, 470 U.S. 675, 682 (1985). Reasonable suspicion is a "less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). In this regard, "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Id*. The government bears the burden to prove by a preponderance of the evidence that the police had reasonable suspicion to make the stop. *Torres-Ramos*, 536 F.3d at 552. Here the suspicion was that the defendants were involved in a scam which involved buying expensive electronic merchandise from one Wal-Mart store using counterfeit money and returning that merchandise to another Wal-Mart store for real money.

When Officer Wright made the decision to stop the suspect vehicle, he had quite a bit of information from Johnson. He knew the defendants had parked their vehicle far from the entrance, that the vehicle had an out-of-state tag, and that the defendants had come from the same vehicle but had left it at separate times. He also knew that both defendants had gone to the

9

service desk with cash receipts to make returns of high-end electronics but that neither man had acknowledged the other. Finally, based on his own experience and based on the experience of Johnson as a loss prevention specialists at Wal-Mart, Wright also knew that all these factors fit the scenario of a scam in which persons would purchase high-end electronics with counterfeit bills and then attempt to make returns at a different Wal-Mart store for cash.[4] As defendants' counsel noted, each individual piece of information is, by itself, innocuous. However, upon consideration of *all* the information as a whole, I conclude Officer Wright had reasonable suspicion to believe the defendants were involved in criminal activity. Thus, a brief *Terry* stop to ask questions was constitutionally justified.

Almost immediately after Wright initiated the *Terry* stop, he obtained additional information in the form of the marijuana odor and the marijuana shake on the backseat of the car sufficient to continue the detention of the defendants in order to further investigate. This information, the marijuana odor and shake, also gave him probable cause to search the vehicle for marijuana,[5] although the analysis of probable cause to search the vehicle is not crucial to this motion since the defendants, as passengers, did not have a legitimate expectation of privacy in the vehicle.

---

4 The undersigned does not find the email bolos to be an important factor supporting reasonable suspicion in this case because the suspects in the photos attached to the email bolos did not look like the defendants.

5 *See e.g., United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) ("we find that Agent Perman's smelling the marijuana [in the truck] then constituted probable cause to believe there was marijuana in the vehicle"); *United States v. $118,170.00 in U.S. Currency,* 69 Fed. Appx. 714, 716 (6th Cir. Jul. 9, 2003) (unpublished) ("The smell of marijuana alone constitutes probable cause to believe that drugs are in the vehicle and will justify searching without a warrant.")

During the search of the vehicle, the officers found and seized a large bundle of cash in the console and many expensive electronics in the trunk. At the suppression hearing, defendant Dukins seemed to argue that even if the police did not violate his constitutional rights by searching the vehicle, he still could and does contest the *seizure* of the electronics and cash.

"In general, seizures of property require probable cause." *Bennett v. City of Eastpointe*, 410 F.3d 810, 825 (6th Cir. 2005) (citing *United States v. Place*, 462 U.S. 696, 701 (1983). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).

> The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). As noted in *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983):
>> [P]robable cause is a flexible, common sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief" . . . that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. (citations omitted).
>
> Moreover, the existence of probable cause should be determined on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983). This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective.

*United States v. Barrett*, 890 F.2d 855, 861 (6th Cir. 1989), *superceded on other grounds as stated in United States v. Williams*, 940 F.2d 176, 181 n. 3 (6th Cir.1991).

In addition to all the factors leading to the initial detention of the defendants, the undersigned has also relied on other factors to conclude there was probable cause to seize the

11

electronics and cash.  Persons rarely carry large bundles of cash in a car console for lawful purposes and some of the cash did not feel genuine.  Further, it is unusual for people to have so many different, high-end electronics in the trunk of their car, and these items along with the cash confirmed the suspected buy-with-counterfeit/return-for-real-money scenario.  Consequently, based on the totality of the circumstances, I conclude seizure of the electronics and cash was also lawful.

## IV. Conclusion

For the reasons stated herein, it is RECOMMENDED defendants' motions to suppress (Docs. 25 and 26) be DENIED.[6]

SO ORDERED.

ENTER.

S /William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[6]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general.  *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).